IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ORLANDO FERNANDEZ      :
     Plaintiff          :
                           :
     v.                   :    CIVIL NO. 1:12-CV-0278
                           :
DONALD REIHART, et al.    :    (Judge Caldwell)
     Defendants     :
                           :
                           :

*M E M O R A N D U M*

I.  *Introduction*

       Plaintiff, Orlando Fernandez, a citizen of the Dominican Republic, is an ICE detainee currently confined at the Pike County Prison in Lords Valley, Pennsylvania. He filed this counseled 42 U.S.C. § 1983 lawsuit based on his treatment while he was a detainee at the York County Prison in York, Pennsylvania.

       The "Medical Defendants" filed a motion to dismiss the claims against them in the original complaint. By memorandum and order of November 8, 2012, we granted the motion but allowed Plaintiff leave to file an amended complaint, and also allowed him to limit the amended complaint to his claims against the Medical Defendants. *Fernandez v. Reihart*, 2012 WL 5463129 (M.D. Pa.).

       Plaintiff has filed an amended complaint against the Medical Defendants setting forth five causes of action: (1) a claim that the medical and mental-health care he

received violated Eighth Amendment standards; (2) a claim that the conduct of certain medical defendants inflicted physical brutality upon him in violation of Eighth Amendment standards; (3) a claim that the medical care he received violated his right to equal protection because it was based on his race, national origin and alienage; (4) a claim against certain medical defendants that they violated his right to due process by denying him the full and fair benefit of the prison grievance system when handling his complaints about his medical and mental-health care; and (5) a claim against certain of the medical defendants that the medical and mental-health care he received violated his right to substantive due process because it shocked the conscience.

We are considering the Medical Defendants' motion pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the amended complaint for failure to state a claim upon which relief may be granted.[1]

II. *Standard of Review*

In considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "[w]e 'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the

---

[1] The Medical Defendants are: Dr. Rollings-Mazza and Dr. Erik Von Kiel, two physicians who work for the York County Prison; and the following employees of Prime Care Medical, Inc., a company that provides medical services at the prison, Jennifer Miosi, Chris Jensen, Toby Catone, Patrick Gallagher, Jeff Leer, Shannon Tyler, Robin Rochow, Michelle Rau, Laura Skaggs, and John/Jane Does. Defendant Gallagher was not included on the first motion to dismiss, but is included on the second motion as the amended complaint makes allegations against him. Additionally, although Plaintiff only names one John/Jane Doe defendant in the amended complaint, there seem to be several John/Jane Doe defendants.

plaintiff may be entitled to relief.'" *Byers v. Intuit, Inc.,* 600 F.3d 286, 291 (3d Cir. 2010)(quoted case omitted).

A complaint need only contain "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), and detailed factual allegations are not required, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007). Nonetheless, a complaint has to plead "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570, 127 S.Ct. 1955 at 1974. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Twombly*, 550 U.S. at 556, 127 S.Ct. at 1965). "[L]abels and conclusions" are not enough, *Twombly,* 550 U.S. at 555, 127 S.Ct. at 1964-65, and a court "'is not bound to accept as true a legal conclusion couched as a factual allegation.'" *Id.*, 127 S.Ct. at 1965 (quoted case omitted).

The Third Circuit has described the Rule 12(b)(6) inquiry as a three-part process:

> First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013)(quoted cases omitted).[2]

With this standard in mind, we set forth the background to this litigation, as Plaintiff alleges it.

III.   *Background*

Plaintiff was an ICE detainee at York County Prison from December 28, 2009, through January 2011.  (Doc. 16, Am. Compl. at p. 4).  "The health care received by aliens must be coordinated between York County Prison and the Department of Homeland Security."  (*Id.* ¶ 3).  As a consequence, the named defendants "provide less vigorous medical treatment to alien detainees than to County inmates so as to maintain good standing with [the] federal government by keeping costs low making the housing contract appealing to the Department of Homeland Security."  (*Id.*).  Additionally, "Prime Care medical staff, including the named Defendants, are aware of the necessity of keeping health care costs of aliens such as the Plaintiff low and do so by displaying deliberate indifference to the serious health care needs of aliens such as the Plaintiff."  (*Id.* 2d ¶ 3).

---

[2]   Plaintiff is therefore wrong in asserting that he does not have to plead facts and that he is entitled to use discovery to find the facts that would support his complaint.  We note that in making this argument Plaintiff relies on cases decided before *Twombly* and *Iqbal*.

A. *Injuries Stemming From the Alleged Assault on February 16, 2010*

Plaintiff alleges that on February 16, 2010, he was assaulted by corrections personnel when they threw him to the floor while he was handcuffed and then "fell upon" him. (Doc. 16, Am. Compl. ¶¶ 1, 9). The assault resulted in injuries to Plaintiff's "neck, shoulder, wrists, hand, thumb, knee, arm, head, back, [and] other injuries." (*Id.* ¶ 9). Plaintiff was then brought to the "crosshalls medical unit." (*Id.* ¶ 11).

At the medical unit, Plaintiff was examined by defendant nurse Laura Skaggs and defendant nurse John/Jane Doe. (*Id.*). He told Skaggs "he was in pain" and how he had been injured. (*Id.*). He asked the two nurses "to transport him to the hospital for evaluation and treatment because he was in severe pain." (*Id.*). He told Nurse Skaggs "she was hurting him" during the examination. (*Id.*). "Plaintiff was examined briefly by Skaggs and Doe who informed prison staff that Plaintiff was fine and fit to return to his unit even though the Plaintiff asserted that he was in severe pain." (*Id.* ¶ 12). They gave him "no actual medical treatment for his pain or injuries." (*Id.* ¶ 13). Nurse Skaggs acted in this way because "of her personal animus toward the Plaintiff and efforts to interfere with the Plaintiff's receipt of adequate health care as well as retaliate against the Plaintiff due to his persistent endeavor to obtain health care for his serious medical needs." (*Id.*).

During the examination, Plaintiff asked Skaggs and Doe for the names and badge numbers of the officers who had assaulted him. (*Id.* ¶ 11). Refusing to do so, they "laughed at, ridiculed, mocked and intentionally humiliated the Plaintiff." (*Id.* ¶ 12).

Skaggs acted this way because of Plaintiff's "alienage in conjunction with his persistence in receiving health care." (*Id.*).

On the same day, Plaintiff filed a grievance and then a sick call slip concerning his injuries. (*Id.* ¶ 14). He was seen by nurse Brennan Ganbler. He explained to her where he had been injured. (*Id.*). She did not know what to do for him, and she and nurse John/Jane Doe put him in a wheelchair and brought him to the crosshall medical unit for further observation by the staff there. (*Id.*). At the medical unit, Nurse John/Jane Doe examined his ankle and directed that it be treated with ice. (*Id.*).

Plaintiff was then taken to the physician's assistant's office and was examined by defendant physician's assistant Toby Catone. (*Id.* ¶ 15). Plaintiff explained his injuries to Catone. (*Id.*). Catone "performed basic care upon Plaintiff, including listening to Plaintiff's heart beats and breathing." (*Id.*). During the examination, Defendant Catone "pressed" on Plaintiff's back and Plaintiff "screamed out in pain." (*Id.*). Catone "conducted no further examination, prescribed pain medication and directed Plaintiff to leave her office." (*Id.*).

Two days later, on or about February 18, 2010, Plaintiff "was called to the crosshalls medical unit." (*Id.* ¶ 16). He requested permission to use a wheelchair. (*Id.*). The request was denied, he was handcuffed, and told to hop to the medical unit. (*Id.*). At the unit, Plaintiff's ankle and thumb were x-rayed. (*Id.*). He requested additional X-rays of his hand, wrists, shoulder and back because of the injuries to those areas and his "severe pain." Defendant nurse Rau denied the request. (*Id.* ¶¶ 16-17). Rau's actions

were motivated by "her personal animus toward the Plaintiff and efforts to interfere with his receipt of adequate medical care as well as retaliate against the Plaintiff due to his persistent endeavor to obtain health care for his serious medical needs as well as his alienage." (*Id.* ¶ 17).

Plaintiff requested that Rau permit him to use a wheelchair to return to his housing location. (*Id.* ¶ 18). Even though she knew about Plaintiff's injuries and complaints of "severe pain," Rau initially denied the request. (*Id.*). Only after Plaintiff "continued to explain that he could not walk on his injured ankle and after 10 or more minutes," did Rau permit him to use a wheelchair. (*Id.*).

Thereafter, Plaintiff apparently filed several sick call slips stemming from the alleged assault with unsatisfactory results, as Plaintiff alleges he filed a grievance on February 23, 2010, seven days after the alleged assault, regarding "delays" in responding to the slips. (*Id.* ¶ 20). Because an attorney from Philadelphia had requested copies of Plaintiff's medical records, Plaintiff received a medical evaluation on March 5, 2010, after an apparent physical examination on February 24. (*Id.*).

This medical evaluation of March 5 was apparently in the form of a response to one of Plaintiff's grievances by the John/Jane Doe complaint supervisor. (*Id.* ¶ 22). This response noted: "that the Plaintiff [had been] evaluated for his complaint of pain on February 24, 2010 and had received pain medication; that "the X ray examination of the Plaintiff's ankle/foot and hand were negative; that Plaintiff did not require a wheelchair for movement, but that "he would receive an additional examination on that

same day"; that "Plaintiff had no noted injuries and that after an examination the Plaintiff had no obvious injuries/deformities other than bruising." (*Id.*). "Plaintiff was prescribed a pain reliever/muscle relaxant." (*Id.*) "The Complaint Supervisor Doe had access to the full content of the Plaintiff's medical files when the assertions regarding the Plaintiff's need for health care were made." (*Id.*).

Plaintiff continued to complain about pain and his need for a wheelchair. Some ten days after he received the above response, on or about March 15, 2010, Plaintiff was examined by physician's assistant Mosonyi. (*Id.* ¶ 24). He "told Mosonyi that he was in a lot of pain, had scars on his wrist from where he had been handcuffed and that he needed a wheelchair to get around." (*Id.*). Mosonyi provided Plaintiff with a wheelchair for use in the medical unit.

At this time, Mosonyi and defendant head nurse Miosi examined Plaintiff. (*Id.*). Plaintiff asked Miosi for a wheel chair to use in his housing area. (*Id.*). "Miosi informed Plaintiff that he could not have a wheelchair in his housing area unless he agreed to go to the segregation unit otherwise he would have to use crutches." (*Id.*). "Miosi's justification for denying the Plaintiff the use of a wheelchair was not grounded in any medical fact, factor or consideration. Miosi's conduct occurred on account of her personal animus toward the Plaintiff and efforts to interfere with the Plaintiff's receipt of adequate health care as well as retaliate against the Plaintiff due to his persistent endeavor to obtain health care for his serious medical needs and his alienage." (*Id.*).

Finally, about a month after the alleged assault and about a month after Plaintiff had begun requesting it through sick call slips and grievances, Plaintiff received his desired medical treatment. (*Id.* ¶ 25). "On or about March 16, Plaintiff was called to medical for X-ray examinations of his knees, back, and neck and was also provided with crutches . . . ." (*Id.*). "On or about March 17, Plaintiff was seen by Dr. Von Kiel who provided Plaintiff with stronger medication for his pain and put in [a] request for an examination at York Hospital." (*Id.*). Dr. Von Kiel had been "assigned direct responsibility for the Plaintiff's medical care" but had not attempted "to examine or inquire as to the Plaintiff's health care needs during" the month after Plaintiff was injured. (*Id.*).

On or about March 30, 2010, about six weeks after the alleged assault, Plaintiff was examined at the York Hospital for the first time. The doctor's evaluation revealed that Plaintiff had a broken rib, knee injuries, and nerve damage to his left thumb. (*Id.* ¶ 26). Plaintiff "was given knee injections" and was told "the injuries to his right ankle, knees and left hand would require physical therapy." (*Id.*). "The injuries detected during this examination affected the Plaintiff's mobility and caused him to suffer continuous, severe pain." (*Id.*). "Despite being directed to provide the Plaintiff with physical therapy, the Plaintiff did not receive physical therapy." (*Id.*).

"Plaintiff was unable to walk from approximately February 16 through April 4, 2010 and required the use of a wheelchair and/or crutches to move through the facility during that time period due to the assault and resulting injuries about which he had informed medical staff and the named Defendants. The named Defendants were all

-9-

aware of the Plaintiff's injuries and assertions of severe pain yet denied the Plaintiff continuous access to use of a wheelchair." (*Id.* ¶ 19).

Plaintiff continued to complain about severe pain stemming from the alleged assault. On or about April 7, 2010, defendant Catone saw him in the medical unit, and Plaintiff complained about severe pain. (*Id.* ¶ 27). Despite having access to Plaintiff's medical records and knowing about the diagnoses by the doctors at York Hospital, however, Catone made no effort to treat Plaintiff. (*Id.*). "Catone was intentionally indifferent to the Plaintiff's medical needs on account of personal animus directed toward the Plaintiff due to the Plaintiff's persistent request for medical care and his alien status." (*Id.*).[3]

On April 13, 2010, Catone examined him again, and Plaintiff "explained that he was still having pain in his knees, ankle and shoulder and had not yet received any therapy to which Catone mockingly replied that Plaintiff would get therapy "'when he gets it.'" (*Id.* ¶ 28). "Catone was intentionally indifferent to the Plaintiff's medical needs on account of personal animus directed toward the Plaintiff due to the Plaintiff's persistent request for medical care despite knowing of the directive that the Plaintiff receive physical therapy and despite having access to the Plaintiff's medical records outlying the Plaintiff's medical needs." (*Id.*).

---

[3]  Plaintiff would later file a grievance alleging that Catone, Rochow, and a medical staff John/Jane Doe had not prescribed medication "sufficient for his needs." (*Id.* ¶ 48).

"On or about April 16, 2010 Plaintiff was called to the medical unit for physical therapy but did not receive physical therapy for his knees or ankle." (*Id.* ¶ 29). "On or about May 11, 2010, Plaintiff was taken to York Hospital for an examination and therapy." (*Id.* ¶ 31). On or about May 21, 2010, he did receive modest physical therapy at the INS medical unit "and was told to bend the knees as much as possible to address the problem." (*Id.* ¶ 33). He also received a medication treatment pass for a muscle rub but no pain medication. (*Id.*).

Plaintiff continued to complain about severe pain on May 18, 2010, (to nurse John/Jane Doe (*id.* ¶ 31); May 21, 2010, (to nurse John/Jane Doe (*id.* ¶ 33), June 2, 2010, (to Dr. Von Kiel about pain in his knees, back shoulder and ankle), (*id.* ¶ 35), on July 29, 2010, August 23, 2010, (*id.* ¶ 40), and on October 7, 2010, (to physician's assistant Rochow). (*Id.* ¶ 45). He asked Rochow if he could see a doctor at York Hospital. (Id.). Rochow did not act on the request even though Plaintiff's file indicated that the care requested was needed. (*Id.*). She was motivated by "her personal animus toward the Plaintiff and efforts to interfere with his receipt of adequate health care as well as to retaliate against the Plaintiff due to his persistent endeavor to obtain health care for his serious medical needs." (*Id.*).

On June 2, 2010, Dr. Von Kiel examined Plaintiff and said he would request that Plaintiff be sent to York Hospital for an examination. (*Id.* ¶ 35). On June 9, 2010, Dr. Von Kiel examined Plaintiff again and said that he had requested that Plaintiff be examined at York Hospital. (*Id.* ¶ 38). However, on June 30, 2010, physician's assistant

Doe told Plaintiff he would not be taken to York Hospital as there was no need. (*Id.*). Dr. Von Kiel made no attempt to intercede on Plaintiff's behalf, (*id.*), but did say on August 23, 2010, he would request that Plaintiff be seen at York Hospital, after Plaintiff had been called to the medical unit to see Dr. Von Kiel and complained of severe pain. (*Id.* ¶ 40).

"On or about August 31, 2010, Plaintiff was taken to York Hospital for evaluation where he received three injections, one in each knee and one in his left shoulder." (*Id.* ¶ 41). "At the examination, Hospital personnel told the Plaintiff that he would never regain feeling in his left thumb because the damage was permanent and that Plaintiff's file would be marked as he should receive treatment at the hospital as often as was needed." (*Id.*). "Plaintiff did not receive health care as often as was needed despite the directive from the Doctor at York Hospital." (*Id.*). On October 7, 2010, Plaintiff requested an examination at York Hospital from physician's assistant Rochow, but she took no action on that request. (*Id.* ¶ 45).

On May 30, 2010, Plaintiff requested a low bunk from INS medical and was told that the request would have to be approved by a physician's assistant. (*Id.* ¶ 33). On June 1, 2010, Plaintiff asked Catone for a low bunk, and she said she could not help him with that problem, despite being a physician's assistant. (*Id.* ¶ 34). Catone was motivated by "personal animus and an attempt to interfere with the Plaintiff's receipt of adequate health care as well as retaliate against the Plaintiff for being persistent in his request for medical care to address his health care needs and his status as an alien." (*Id.*). On June 2, 2010, Plaintiff asked Dr. Von Kiel for a low bunk, after having told him

why he needed the low bunk many times before.  (*Id.* ¶ 35).  Dr. Von Kiel authorized

Plaintiff's use of a low bunk, and on June 4, 2010, Plaintiff was permitted to use a low

bunk.  (*Id.*).

       "On or about June 2, 2010, the Plaintiff was notified that he was placed on

medical restriction by medical staff and would remain in that status until cleared. Plaintiff

was restricted from gym activity, sports activity, work on account of his injuries."  (Id. ¶

36).  "The Defendants continued to deny the Plaintiff's need for medical care despite the

fact that they knew that the Plaintiff had been placed on medical restriction.  (Id. ¶ 37).

       B. *Tooth Extraction*

       "In or about late February or early March, 2010, the Plaintiff informed the

named Defendants of his severe tooth pain.  Plaintiff received no treatment, care or

examination regarding the tooth pain."  (*Id.* ¶ 21).  "On or about August 30, 2010, Plaintiff

submitted an inmate grievance . . . regarding tooth pain that he had experienced for 5

months without treatment, tooth infection, refusal to provide antibiotics, and need for an

emergency examination by oral surgeon and extraction of the tooth."  (*Id.* ¶ 42).  "On or

about September 7 Plaintiff filed form 801, an inmate grievance related to lack of

necessary medical care for painful and infected tooth after 6 months of delay and request

for follow up on promise to send him to an oral surgeon."  (*Id.*).  "On or about September

7, 2010, Plaintiff was taken to see an oral surgeon where his abscessed tooth was

extracted."  (*Id.*).

C. *Mental-Health Conditions*

"On or about May 18, 2010, Plaintiff filed form 801 regarding inadequate treatment for mental health issues including depression, anxiety, fear, nightmares, stress and paranoia." (*Id.* ¶ 32). "On or about May 20, 2010 Plaintiff filed form 801 requesting treatment and medication for mental health issues." (*Id.*). "On or about June 3, 2010, Plaintiff filed form 801 regarding asserted improper treatment of his mental health issues including depression, anxiety, paranoia and fear . . ." (*Id.* ¶ 37).

On July 21, 2010, defendant Donald Reihart, York County solicitor, denied Plaintiff's appeal of a grievance regarding Plaintiff's mental-health issues, and in doing so, acknowledged Plaintiff's need for mental-health care. (Id. ¶ 39). Reihart 's assertions regarding the Plaintiff's mental health were based on his consultation with the medical defendants and reliance upon records they provided him. (*Id.*).

On December 12, 2010, Plaintiff filed a grievance asserting that defendants Jeff Leer and Shannon Taylor improperly handled his mental-health sick call requests. (*Id.* ¶ 51).[4] "This conduct occurred on account of their personal animus toward the Plaintiff and efforts to interfere with his receipt of adequate health care as well as to retaliate against the Plaintiff due to his persistent endeavor to obtain health care for his serious medical needs as well as his alienage." (*Id.*).

---

[4]    The grievance apparently had something to do with Leer's disclosure of private information.

"The grievance also asserted that Pat Gallagher and Dr. Rollings failed to provide Plaintiff with adequate or appropriate mental health services. Dr. Rollings for her part, made no effort to provide mental health services to the Plaintiff despite his need for those services as indicated by the content of his file to which she had access. Though she indicated that the Plaintiff was "disruptive" during the one occasion she met with him, she made no other attempt to evaluate or provide mental health assistance to the Plaintiff. The delay in the Plaintiff's receipt of mental health treatment, essentially the denial of such treatment, prolonged the Plaintiff's unnecessary anguish, pain and suffering." (*Id.* ¶ 52).

"Rollings and Gallagher avoided an inquiry into the Plaintiff's mental health status in the exercise of their professional judgment. The conduct of both Rollings and Gallagher occurred on account of their personal animus toward the Plaintiff and efforts to retaliate against the Plaintiff due to his persistent endeavor to obtain health care for his serious medical needs as well as his alienage." (*Id.* ¶ 53).

On December 15, 2010, Plaintiff filed a grievance "asserting that he had not received proper mental health care for his severe anxiety, depression, paranoia and nightmares." (*Id.* ¶ 54). "In an undated response to" the grievance, Gallagher asserted that Plaintiff failed to describe any symptoms of mental illness nor did he present any treatable symptoms. (Id. ¶ 55). Gallagher also said that Plaintiff "was seen by mental health staff within one day of his sick call on November 29, 2010." (*Id.*). Gallagher's position contradicted Reihart's admission "that the Plaintiff had mental health issues that

required treatment and despite other relevant documentation contained in the Plaintiff's medical files to which Gallagher had access." (*Id.*). "Gallagher's conduct occurred on account of his personal animus toward the Plaintiff and his efforts to interfere with Plaintiff's receipt of appropriate health care and to retaliate against the Plaintiff due to Plaintiff's persistent endeavor to obtain health care for his serious medical needs." (*Id.*).

D. *Injuries Stemming From Assault on November 24, 2010*

On November 24, 2010, Plaintiff was assaulted by a County inmate named "Myers." (*Id.* ¶ 49). "Plaintiff was taken to the medical office but received inadequate care for the injuries he sustained at the hands of inmate Myers." (*Id.*).

E. *Untreated High Blood Pressure*

On March 9, 2010, a nurse in the BAU (Behavioral Adjustment Unit) took Plaintiff's blood pressure and told him it was high. (*Id.* ¶ 23). "Plaintiff received no further care, treatment or examination regarding his high blood pressure reading." (*Id.*). On April 12, 2010, another BAU nurse "wanted to know why Plaintiff had been filing sick call requests and he told her about his severe physical pain and informed her that the medical staff was not monitoring his high blood pressure." (*Id.* ¶ 28). "Medical documentation dated June 23, 2010 indicate that Plaintiff was classified as having hypertension as a current medical problem." (Id. ¶ 38). Plaintiff apparently alleges that Dr. Von Kiel made no effort to see that Plaintiff received the medical care his medical needs required. (*Id.*).

F. *Due Process Claim Based on Failure to Grant
Administrative Grievances on Health Care*

At some point, Plaintiff apparently had an interview for a psychological examination, and Plaintiff found the interview unsatisfactory and filed a grievance about it.  Gallagher wrote an undated response to the grievance, asserting that "Plaintiff was uncooperative with Dr. Rollings resulting in the termination of the psychological examination interview."  (*Id.* ¶ 30).  "Gallagher did not indicate the basis for his assertion nor did he indicate what treatment Plaintiff would receive or when it would be provided to him."  (*Id.*).  As noted above, Gallagher had responded to another grievance about Plaintiff's mental-health care by asserting that Plaintiff failed to describe any symptoms of mental illness nor did he present any treatable symptoms.  (Id. ¶ 55).

Defendant Jensen responded to four grievances.  On September 14, 2010, he denied "Plaintiff's medical grievance submission."  (*Id.* ¶ 43).  On October 2, 2010, he denied a grievance by asserting that there was no evidence that Plaintiff was injured on February 16, 2010, and by asserting that medication was being given to Plaintiff.  (*Id.*).  "Jensen's assertions were made in full knowledge of the content of the Plaintiff's file regarding his treatment at York Hospital, his placement on medical restriction, his limited receipt of physical therapy as well as his high blood pressure diagnosis."  (*Id.*).  On October 29, 2010, he denied a grievance in connection with a request for additional medical evaluations.  (*Id.* ¶ 46).  On December 9, 2010, he denied a complaint concerning multiple prior grievances.  (*Id.* ¶ 50).

As noted above, on March 5, 2010, the John/Jane Doe complaint supervisor also denied a grievance related to treatment of Plaintiff's injuries stemming from the alleged assault on February 16, 2010. (*Id.* ¶ 22).

IV.  *Discussion*

      A.  *The Eighth Amendment Medical Claim Based on Treatment for Injuries From the Alleged Assault on February 16, 2010*

Plaintiff bases his constitutional medical claim on the Eighth Amendment. However, since he is an ICE detainee, not a convicted inmate, any such claim is covered under the Due Process Clause of the Fifth or Fourteenth Amendments, not the Eighth Amendment. *See John v. York County Prison*, No. 09-CV-134, 2009 WL 1956210, at *2 (M.D. Pa. July 6, 2009)(Caldwell, J.). Nonetheless, since due process provides as much protection as the Eighth Amendment, he can rely on the Eighth Amendment standard to make his claim. *See Jackson v. City of Philadelphia*, ___ F. App'x ___, ___, 2013 WL 363463, at *3 (3d Cir. 2013)(nonprecedential).

The Eighth Amendment "requires prison officials to provide basic medical treatment to those whom it has incarcerated." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999)(*citing Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). The Eighth Amendment prohibits the "'unnecessary and wanton infliction of pain contrary to contemporary standards of decency.'" *Id.* (*quoting Helling v. McKinney*, 509 U.S. 25, 32, 113 S.Ct. 2475, 125 L.Ed.2d 22, 31 (1993)). In the context of prison medical care, in

order to state a cognizable claim for the denial of medical treatment, the plaintiff must allege that (1) he had a serious medical need, and (2) that the defendants were deliberately indifferent to that need. *Id.*

Deliberate indifference requires "obduracy and wantonness," "a recklessness or conscious disregard of a serious risk" to the prisoner. *Rouse, supra*, 182 F.3d at 197 (quoted cases omitted). Accordingly, "claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute 'deliberate indifference.'" *Rouse, supra*, 182 F.3d at 197. And one doctor's disagreement with the professional judgment of another doctor is not actionable under the Eighth Amendment. *See White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990). Neither is the plaintiff's disagreement with the medical treatment he has received. *See Young v. Quinlan*, 960 F.2d 351, 358 n.18 (3d Cir. 1992).

In moving to dismiss this claim, Defendants argue that it fails to establish deliberate indifference. In fact, they argue that the allegations show almost constant care for Plaintiff's complaints. We agree with Defendants that deliberate indifference is not shown by the allegations.

We start our analysis by not crediting certain allegations that are totally conclusory. Plaintiff has alleged that the defendants "provide less vigorous medical treatment to alien detainees than to County inmates" to keep costs low so that the housing contract [is] appealing to the Department of Homeland Security." (Am. Compl. ¶ 3). The Prime Care medical staff are also "aware of the necessity of keeping health care

costs of aliens . . . low and do so by displaying deliberate indifference to the serious health care needs of aliens . . . ." (*Id.* 2d ¶ 3). Additionally, various defendants are alleged to have acted out of "personal animus toward the Plaintiff" with "efforts to interfere with the Plaintiff's receipt of adequate health care as well as [to] retaliate against the Plaintiff due to his persistent endeavor to obtain health care for his serious medical needs as well as his alienage." (See, e.g., Am. Compl. ¶ 17). As noted above, the Rule 12(b)(6) standard of review does not permit us to use such conclusional allegations in evaluating the merits of Plaintiff's claim. We thus limit our analysis to the remaining allegations to see if they support Plaintiff's constitutional medical claim.

We do not believe they do so entirely, for they fail to support an inference of deliberate indifference for all of the defendants' conduct. Plaintiff alleges he was seen by medical personnel on three separate occasions on the same day as the alleged assault. First, he was seen by defendant nurse Skaggs and defendant nurse John/Jane Doe. These personnel did examine him. Plaintiff complains that they did not send him to the hospital, but his disagreement with their treatment does not establish deliberate indifference, nor does the fact that Skaggs hurt him during the examination, or that she decided he was "fine." Second, Plaintiff was seen by a nurse John/Jane Doe, but this defendant did treat Plaintiff, examining his ankle and directing that it be treated with ice. Third, Plaintiff was then examined by defendant physician's assistant Toby Catone, who treated him by prescribing pain medication for him.

Two days later, Plaintiff's ankle and thumb were x-rayed. (*Id.*). Defendant

nurse Rau denied his request for X-rays of his hand, wrists, shoulder and back, but this is simply a disagreement over treatment.

Thereafter, Plaintiff continued to complain about pain and his need for a wheelchair. On March 15, 2010, Plaintiff was examined by defendant head nurse Miosi. Plaintiff asked Miosi for a wheel chair to use in his housing area. Miosi gave him the option to use crutches, or if he wanted a wheelchair, he had to go to the segregation unit. There was no deliberate indifference in being given this option. Plaintiff did use the crutches.

Other treatment was slow in coming, but we cannot infer deliberate indifference. About a month after the alleged assault, on March 16, 2010, Plaintiff had X-rays of his knees, back, and neck and was also provided with crutches. The next day, Dr. Von Kiel gave him stronger medication for his pain.

About six weeks after the alleged assault, the first visit to York Hospital occurred on March 30, 2010, and the evaluation there did reveal something significant, a broken rib (along with knee injuries, and nerve damage to his left thumb). A broken rib is serious, but again the failure to detect it amounts to no more than negligence. *Brown v. Borough of Chambersburg,* 903 F.2d 274, 278 (3d Cir. 1990)(failure of prison physician to detect two broken ribs was at most "an exercise of deficient professional judgment").

Plaintiff continued to complain about severe pain stemming from the alleged assault. On or about April 7, 2010, defendant Catone saw him in the medical unit, but refused to help him. Plaintiff complained about severe pain on May 18, 2010, to nurse

John/Jane Doe; on May 21, 2010, to nurse John/Jane Doe; on June 2, 2010, to Dr. Von Kiel about pain in his knees, back shoulder and ankle; on July 29, 2010; August 23, 2010; and on October 7, 2010, to physician's assistant Rochow. We view these complaints as a disagreement about the care Plaintiff was receiving for his pain. Dr. Von Kiel had previously given him stronger pain medication.

Other allegations show that Plaintiff was receiving proper medical care. On May 30, 2010, he requested a low bunk. Dr. Von Kiel authorized his use of a low bunk, and on June 4, 2010, Plaintiff was permitted to use a low bunk. On June 2, 2010, Plaintiff was placed on medical restriction by medical staff. He was restricted from gym activity, sports activity, and work on account of his injuries.[5]

The only aspect of this claim that is viable concerns the lack of physical therapy. On March 30, 2010, Plaintiff's first visit to York Hospital, Plaintiff was told "the injuries to his right ankle, knees and left hand would require physical therapy." (Am. Compl. ¶ 26). On April 13, 2010, Catone mockingly told Plaintiff that he would get therapy "'when he gets it.'" (*Id.* ¶ 28). Plaintiff did apparently receive some physical therapy three days later, on April 16, 2010, but not on his knees or ankle. He also apparently received some therapy on May 11, 2010, at York Hospital and on May 21, 2010, some "modest physical therapy" at the INS medical unit "and was told to bend the

---

[5]    Plaintiff alleges that personnel from York Hospital told him his "file would be marked as he should receive treatment at the hospital as often as was needed." (*Id.* ¶ 41). However, he "did not receive health care as often as was needed despite the directive from the Doctor at York Hospital." (*Id.*). This directive is too vague to support a claim involving deliberate indifference.

knees as much as possible to address the problem." (*Id.* ¶ 33). On May 31, 2010, he also received a medication-treatment pass for a muscle rub but no pain medication. On August 31, 2010, when Plaintiff was at York Hospital receiving three injections, one in each knee and one in his left shoulder, he was told that "he would never regain feeling in his left thumb because the damage was permanent." (*Id.* ¶ 41).

There may be an Eighth Amendment violation when specific instructions from a treating physician are not followed. *White*, *supra*, 897 F.2d at 109-110. We will allow this claim to proceed against Dr. Von Kiel and physician's assistant Catone.[6]

## B. *The Eighth Amendment Claim for Mental-Health Conditions*

Beginning on May 18, 2010, and ending on December 12, 2010, Plaintiff filed several grievances alleging he was receiving "inadequate treatment for mental health issues including depression, anxiety, fear, nightmares, stress and paranoia." (*Id.* ¶ 32). He also alleges that defendant Dr. Rollings "made no effort to provide mental health services to the Plaintiff despite his need for those services as indicated by the content of his file to which she had access." (*Id.* ¶ 52).

We will dismiss this Eighth Amendment claim. Conclusory assertions of inadequate treatment or no treatment at all based on an assertion of need for the services arising from the "content" of Plaintiff's file is insufficient.

---

[6] In his opposition brief, Plaintiff argues that he cannot make specific allegations because the defendants refused him a copy of his medical records. This argument is meritless as Plaintiff has been represented by counsel in this litigation.

C.  *The Eighth Amendment Claim Based on Physical Brutality*

Plaintiff alleges defendants Miosi, Skaggs, Doe, and Catone violated the Eighth Amendment "by subjecting the Plaintiff to unnecessarily severe physical pain as the pain was inflicted by each Defendant under circumstances in which they were provided with immediate and direct knowledge from the Plaintiff that such severe pain was being inflicted upon the Plaintiff."  (*Id.* ¶ 65).

We reject this claim.  The allegations against these defendants do not support such a claim.

D.  *The Equal Protection Claim*

Plaintiff alleges that defendants Rollings, Von Kiel, Miosi, Jensen, Catone, Leer, Taylor, Rochow, Rau, Skaggs, and Doe violated his right to equal protection when they "provid[ed] the Plaintiff with disparate medical treatment on account of alienage," race and national origin.  (*Id.* ¶¶ 69 and 70).

To succeed on an equal protection claim, a plaintiff must show that: (1) he was treated differently (2) from similarly situated persons.  *Williams v. Morton*, 343 F.3d 212, 221 (3d Cir. 2003).

We agree with Defendants that this claim fails because Plaintiff fails to allege sufficient facts to support it.  Conclusory allegations of discrimination based on alienage, race and national origin are not enough.

E. *The Due Process Claim For Denying Plaintiff the Full
and Fair Benefit of the Prison Grievance System When
Handling His Complaints About His Medical and
Mental-Health Care*

Plaintiff alleges that defendants Gallagher, Jensen and Doe, violated his

right to due process by denying him "the full and fair benefit" of the prison grievance

system when handling his complaints about his medical and mental-health care. (Am

Compl. ¶ 75).

A procedural due process claim must allege (1) a deprivation of an interest

"encompassed within the Fourteenth Amendment's protection of life, liberty, or property";

and (2) that "available procedures did not provide due process of law." *Ass'n New Jersey

Rifle & Pistol Clubs v. Governor of New Jersey*, 707 F.3d 238, 240 (3d Cir. 2013)(quoted

case and internal quotation marks omitted).

We agree with Defendants that this claim fails because Plaintiff does not

allege any defect in procedure, merely alleging instead his disagreement with the

decisions made.  It may also be that Plaintiff has no liberty interest in the grievance

process.  *See Anderson v. Pennsylvania*, 196 F. App'x 115, 117 (3d Cir. 2006)

(nonprecedential).


F. *The Substantive Due Process Claim*

Plaintiff alleges that the conduct of defendants Rollings, Von Kiel, Miosi,

Jensen, Catone, Leer, Taylor, Rochow, Rau, Skaggs, and Doe shocks the conscience

and thus violated his right to substantive due process. "To establish a substantive due process claim, a plaintiff must prove the particular interest at issue is protected by the substantive due process clause and the government's deprivation of that protected interest shocks the conscience." *Chainey v. Street*, 523 F.3d 200, 219 (3d Cir. 2008).

In moving to dismiss this claim, Defendants argue in part that it is duplicative of the Eighth Amendment claim (which we decided was really a due-process claim employing the Eighth Amendment standard). In opposing dismissal, Plaintiff apparently agrees the claim is duplicative because he refers us to the arguments he made in regard to the Eighth Amendment claim. In these circumstances, we will dismiss the substantive due process claim as redundant to the Eighth Amendment claim.

### G. *The Eighth Amendment Claim For an Abscessed Tooth*

Plaintiff alleges that in or about late February or early March, 2010, he told the named defendants of severe tooth pain, but he received no treatment or care for the pain. On August 30, 2010, he submitted an inmate grievance about it, and on September 7, he filed another grievance about his painful and infected tooth after six months of delay and request for follow up on promise to send him to an oral surgeon." (*Id.*). On the same day, Plaintiff was taken to an oral surgeon and the abscessed tooth was extracted.

We will allow this claim to proceed against the named defendants as it appears to state a claim for delay in medical treatment for no valid reason. *See Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987).

H. *Injuries Stemming From Assault on November 24, 2010*

On November 24, 2010, Plaintiff was assaulted by a County inmate named "Myers." (Am. Compl. ¶ 49). "Plaintiff was taken to the medical office but received inadequate care for the injuries he sustained at the hands of inmate Myers." (*Id.*).

We will dismiss this claim because it fails to allege sufficient facts and names no defendant.

I. *Untreated High Blood Pressure*

On March 9, 2010, a nurse in the BAU (Behavioral Adjustment Unit) took Plaintiff's blood pressure and told him it was high. (*Id.* ¶ 23). "Plaintiff received no further care, treatment or examination regarding his high blood pressure reading." (*Id.*). On April 12, 2010, another BAU nurse "wanted to know why Plaintiff had been filing sick call requests and he told her about his severe physical pain and informed her that the medical staff was not monitoring his high blood pressure." (*Id.* ¶ 28). "Medical documentation dated June 23, 2010 indicate that Plaintiff was classified as having hypertension as a current medical problem." (*Id.* ¶ 38). Plaintiff apparently alleges that Dr. Von Kiel made no effort to see that Plaintiff received the medical care his medical needs required. (*Id.*).

We agree with Defendants that this claim must be dismissed. It does not allege deliberate indifference on the part of Dr. Von Kiel. Deliberate indifference requires "obduracy and wantonness," "a recklessness or conscious disregard of a serious risk" to the prisoner. *Rouse, supra*, 182 F.3d at 197 (quoted cases omitted). That state of mind

is not met by a vague allegation that the defendant made no effort to see that Plaintiff received the medical care his medical needs required.

V.   *Conclusion*

We must decide whether to permit amendment of the dismissed claims. We must grant leave to amend a civil-rights claim even if a plaintiff does not request it and even if he is represented by counsel. *Fletcher–Harlee Corp. v. Pote Concrete Contractors, Inc.,* 482 F.3d 247, 251 (3d Cir. 2007). We do not have to do so, however, if amendment would be futile. *Id.*

For the reasons given, it would be futile to allow amendment of the procedural and substantive due process claims and the dismissed portions of the Eighth Amendment claim for the February 16, 2010, assault. Other claims might be amendable, but counsel has had two chances to file valid claims, so amendment will not be permitted. *See Kasper v. County of Bucks*, ___ F. App'x ___, ___, 2013 WL 563342, at *4 (3d Cir. 2013)(nonprecedential)(no need to grant leave for further amendment when the amended complaint failed to correct the defects in the original complaint).

We will issue an appropriate order.


/s/ William W. Caldwell
William W. Caldwell
United States District Judge

Date: April 10, 2013

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ORLANDO FERNANDEZ           :
       Plaintiff               :
                                       :
     v.                            :     CIVIL NO. 1:12-CV-0278
                                       :
DONALD REIHART; et al.       :     (Judge Caldwell)
       Defendants          :
                                       :
                                       :

*O R D E R*

AND NOW, this 10th day of April, 2013, upon consideration of the Medical

Defendants' motion (Doc. 17) to dismiss the complaint, it is ORDERED that:

    1.  The motion (Doc. 17) is granted in part and denied in
part.

    2.  Count I, the Eighth Amendment medical claim, is
dismissed except for the following claims: (a) the against Dr.
Von Kiel and physician's assistant Catone for the failure to
provide physical therapy; and (b) the claim against all the
medical defendants for failure to treat Plaintiff's abscessed
tooth.

    3.  Count II, the Eighth Amendment claim alleging physical
brutality against defendants Miosi, Skaggs, Doe and Catone,
is hereby dismissed.

    4.  Count III, the equal protection claim against defendants
Dr. Rollings, Dr. Von Kiel, Miosi, Jensen, Catone, Leer,
Taylor, Rochow, Rau, Skaggs, and Doe, is hereby dismissed.

    5.  Count IV, the procedural due process claim against
defendants Gallagher, Jensen and Doe, for denying him the
full and fair benefit of the prison grievance system, is hereby
dismissed.

6.  Count V, the substantive due process claim against defendants Rollings, Von Kiel, Miosi, Jensen, Catone, Leer, Taylor, Rochow, Rau, Skaggs, and Doe, is hereby dismissed as redundant to Count I.

7.  Any claim based on injuries stemming form an assault on November 24, 2010, and from untreated high blood pressure is hereby dismissed.


 /s/ William W. Caldwell
William W. Caldwell
United States District Judge